Thank you, Councilor. Mr. Tengri, you may begin. Thank you, Your Honor, and I would like to reserve five minutes for rebuttal, if I may. There is no reasonable dispute that the East Bay Hills remain vulnerable to wildfire, especially given the horrifying fires that have blazed across Northern California in recent years. Since 2005, the University of California has worked to remove the non-native trees and vegetation that substantially increase the risk of hazardous wildfire in and around the UC Berkeley campus. Despite the obstacles created by FEMA's unlawful grant termination, the University publicly affirmed in November 2019 its commitment to complete that work. Yet only a month later, the District Court dismissed as moot the University's claims in this case. The University filed this appeal to restore its ability to fully implement the project. The District Court's order of dismissal is based on the flawed premise that the University abandoned the original project by instead pursuing a different project. That critical conclusion is a clear error, and it's contrary to the plain language of all evidence regarding the revised project that was considered by the Court. The University's appeal essentially raises three questions for this Court to resolve. One, is the University now pursuing a different project? Two, did FEMA cause the injury complained of? And three, can the Court redress that injury through effective relief? So first, let me start by noting the University is actively advancing the same project in Strawberry and Claremont Canyons that FEMA approved in 2015, with one key exception. The revised project does not include work in critical species habitat sub-areas within those two, the Strawberry and Claremont Canyon areas. Work in those sub-areas is prohibited by FEMA's unlawful termination, because that termination took away from the University the biological opinion and the take permit under the Endangered Species Act. All of the evidence before the trial court confirms that the University is proposing to remove the same fire-prone non-native vegetation in the same areas studied by FEMA using the same methodology and for the same purpose, reducing wildfire risk to people and property in the East Bay Hills. The dismissal order ignored the plain language of that evidence when it incorrectly concluded that the University is now pursuing a different thinning-only methodology that differed from the methodology in FEMA's EIS. May I ask you a question? What is the scope of review of this court in reviewing whether the finding that the second project, the revised plan, is different from the first FEMA-approved plan? Is it related to that de novo, or do we look at that under use of discretion? It is a de novo review, Your Honor. This was decided as a motion to dismiss, and I believe this court's prior ruling in the Graham v. FEMA action recognizes that in this context, a motion to dismiss based on mootness, the de novo review standard is appropriate. And we believe, again, there is clear error that's evident by the plain language of the material that was considered by the district court with regard to the methodology. Let me just discuss that evidence a little bit. There are four pieces of evidence that were before the district court. All of that evidence came from the University. The Federal Emergency Management Agency, FEMA, has made it very clear it played no role with regard to the revised project, nor did any of the other parties in this action. So their characterizations of that evidence is not entitled to any deference. Further, I would also point out this was the only substantive hearing in this action. This is the first opportunity that Judge Beeler, Magistrate Judge Beeler, had to consider the evidence that was presented. There was no history of motion practice or other opportunities for Judge Beeler to be apprised of the project. The best evidence regarding the scope of the project, and when I say best evidence, it's the most detailed, the most recent, and it was a publicly noticed document, is the EIR Notice of Availability that was published in November 2019. That was provided, and of course that document was released to the public after the briefing was completed. It was submitted to Judge Beeler ahead of the hearing. Judge Beeler affirmed that she had read and considered it. The document is referenced in the opinion, but it's very clear that her findings rely entirely on FEMA's mischaracterizations as to the grant application and really differs from the language not only in that grant application, but certainly in the public document in which the university described to the public exactly what it proposed to do in these areas. The transcript of the hearing shows that Judge Beeler had significant gaps in information with regard to this project. She opened the hearing by saying, oh, it appears the university is no longer pursuing work in Strawberry and Claremont Canyons, and we attempted to correct that, and of course the evidence in each of the documents, all four of the documents, certainly you define the scope of the project. To be clear, the university's revised project includes more than simply the Strawberry and Claremont Canyon areas. It's a project that includes the entire 800-acre Hill Campus area. Claremont Canyon and Strawberry Canyon are two of the most critically impacted areas with regard to fire risk because those are the areas that have, over time, turned into eucalyptus and pine, to use the biological opinion term, incredibly hydrophytic, highly flammable vegetation, non-native vegetation in those areas. That's why... Mr. Tangre, you haven't touched upon, to me, which one of the critical factors is why this case is moved, and that is the primary difference between the FEMA project in the Strawberry Canyon and Claremont Canyon areas, which was an overstory removal, right? Isn't that the primary method? And your project that you see on Kruger Took, which involves a thinning, and I think the conclusion is, well, you know, that's such a major difference that it doesn't matter what happens to this case because UC is off on a different track, right? Thank you, Your Honor. Let me address that directly because that is the clear, factual error that Judge Buehler made in this case. The university is not pursuing a thinning-only methodology with regard to the Claremont and Strawberry Canyon areas. And so let me address that specifically. If you look at all four documents that relate to the revised project, the EIR notice that we talked about, the university's declaration of its assistant vice chancellor supervising the project, the CAL FIRE grant application that was submitted by FEMA into evidence, and the original scope of work presented to obtain a CEQA consultant, all talk about tree removal. They all talk about removal of the overstory trees. Judge Buehler's opinion cites only two language in the CAL FIRE decision that talk about thinning, and that's correct, that that word was used. But the very same pages, and we cite them in our briefs, the very same pages talk about removal of entire trees. It talks about conversion of the eucalyptus forest back to the native oak woodland that was here before the eucalyptus and other pine trees were planted. That's the issue, and candidly, Judge Buehler is citing only to those provisions, only to selected language out of the CAL FIRE agreement that was cited to in FEMA's brief. As we mentioned, FEMA has no responsibility with regard to the revised project, and FEMA ignored language in the same document it cited that talks about tree removal. That language is consistently shown. I think the best evidence on this, Your Honor, is the methodology with regard to the project, to the revised project, is on pages ER 130 to 131. That is the methodology section relating to the fire hazard reduction projects, which include Strawberry Canyon and Claremont Canyon, and the language there tracks very closely the language in FEMA's EIS with regard to those two areas, and that language is at ER 880 to 81. The EIS and the current project both involve the same scope of work, which is removal of the eucalyptus trees. Now, let's be clear. FEMA, I think, to promote its arguments, suggested that there is a black-and-white distinction between tree removal on one hand and thinning only on the other hand. It's pointed out FEMA rejected the thinning-only methodology in its EIS. That was preferred by one community group, and FEMA rejected that as ineffective fire risk management. That said, this is a complex area. Even the sub-areas, just relating to Claremont and Strawberry Canyon, include some areas that include roadways that will be used for fire evacuation, several buildings, academic buildings, and over 500 residences in Claremont Canyon, but it also includes steeply sloped areas, hilltops, areas that are inaccessible by roadways. The university recognized, and both the EIS and their vice project recognized this, there are different techniques that will be used to eliminate the flammable vegetation. In some instances, they can use certain types of equipment and fell the trees, and in other areas, because the topography is different, because the trees are different, because the density of the non-native trees versus native trees is different, they will be culling selectively. In both instances, this is work that will be done by a fire management professional. Again, the best evidence is the current environmental document, the description of the environmental document that the university is moving forward with, and what FEMA approved in 2015 in its own EIS. That language is virtually identical. And that, to your honor's point, that's the fundamental error that really underpins all of Judge Beeler's decision, because she essentially says these are different because there's a different methodology here. University is now abandoning what it's been proposing since 2005 and now pursuing something completely different. That certainly is, again, factually we think that can be verified that that's not the case, but that error is what leads Judge Beeler to also conclude that she cannot redress the injury because it's a different project. So the relief that's requested, restoration of the grant funds, sure, but also restoration of the Environmental Species Act TIG permit that's necessary to complete this work no longer applies because the university is doing a different project. I think when your honors go back and look at those pages, the areas are the same, the methodology is the same, the purpose is the same. If the only distinction, again, is that there are areas within Strawberry and Claremont Canyon that are habitat areas, primarily for the Alameda whipsnake. And for that reason... By the way, who has the ultimate authority, administratively, to make the decision as to whether or not UC can, you know, still take advantage of the incidental TIG statement under the CAL FIRE project? Are you contending that you should be able to rely on the ITS under the CAL FIRE project? Or are you bringing this to it because the ITS can't be used for the CAL FIRE project? Yes, your honor, we are contending that the incidental TIG statement, if FEMA's 2016 amended rod is voided by this court as unlawfully terminated, we would be back where we were in 2015. The incidental TIG statement would apply and would cover this work. And again, the decision between... When you say we would be back where we were in 2015, you mean to say that would include a reinstatement of your FEMA grant. Is that what you mean? It should include reinstatement of the grant, but it would also include... The amended rod did a couple of things. One is it terminated the funding, but FEMA also specifically specified that the provisions of the EIS and the biological opinion, which includes the ITS, the TIG statement, were no longer applicable to the university's project. And that's the causation issue here. In fact, even before FEMA issued the final notice of termination to the university, the U.S. Fish and Wildlife Service, in discussions with the university in planning for the project work that was going to happen in late 2016, there's a relatively narrow window of time, essentially the fall, when this work can occur based on the species issues, based on the climate conditions, et cetera. So the university was preparing for that, was working with Fish and Wildlife Service on its mitigation conditions. And Fish and Wildlife sent an email, it's cited in the record, the August 30, 2016 email, where it says, we understand that FEMA may be withdrawing its funds. If it does so, the federal nexus disappears from this project and the incidental take statement no longer applies. It then instructs the university not to move forward with any work in this area until it obtains a separate take permit. And as we know, and in fact, as the Park District has argued to this court and submitted evidence at the trial court, pursuing that separate permit is a 10-year-long process. I mean, that's why we're here. We are trying to avoid... Council, I have a question on that, though. Didn't the original incidental take statement rely in major part on the methodology of the overstory removal, which would actually increase habitat for the whip snake species? So... It does, Your Honor. Right. But the current project doesn't rely so heavily on the overstory. It does some overstory, but it does a lot of thinning as well. Your Honor, so... How can it be based on the same factual scenario? Understood. Again, that is the fundamental error that Judge Buehler made and is replicated. But let me point out, to the trial court, FEMA argued that this was a thinning-only project. When confronted with the evidence that shows that this is actually the same overstory removal project that allows us to thin but is intended to remove the eucalyptus, FEMA revised its argument and argued to this court that this is a primarily thinning project. And the language that it cites in the EIR notice on that does not relate to the Claremont or Strawberry Canyon projects. It relates to work that's being done in other portions of the 800-acre Hill Campus. And we identified that in our reply brief, but I'll cite to the court. It's on page ER124. The language regarding thinning is describing the evacuation support and fuel break treatment parts of the overall project that the University is moving forward with. That is separate from the fuel fire hazard reduction projects that are being proposed for Claremont and Strawberry Canyon. So, again, the methodology issue, the language in all of these documents is manually, and I'm citing from the scoping notice, page ER125, manually and mechanically removing high fire hazard vegetation and trees. The word thinning does not appear with regard to Claremont and Strawberry Canyon here. So you're absolutely right. Let me ask a follow-up question. So let's assume they're the same project. How, as a practical matter, do you unwind all the UC Berkeley's rescission of the project, FEMA's rescission of the project, the lawsuits, the settlements? I mean, you can't just say, okay, we want our money. You're going to have to unwind a lot of things that have happened between 2015 and now to get there. And how, as a practical matter, does that happen? Thank you, Yaron. It's an excellent question. And respectfully, the university has unwound all of the obstacles here, with the exception of FEMA's termination. So FEMA's termination came first. That occurred in September 2016. Over a month later, the state trial court issued an injunction with regard to the CEQA compliance. So the university addressed that by preparing an EIR. That's what the injunction required. The university could not move forward with its work in this area until it prepared an EIR. The 2019 notice was the notice of preparation of an EIR. The final EIR has now been completed. After public review, that document was issued just last month. It will be certified later this month by the Berkeley campus. Once that is done, the CEQA obstacle is taken care of. And we are back to going forward with the same project, again, the university has been working on since 2005. And, in fact, it was developed long before but applied for this grant in 2005. So the university at that point will be ready to go. The EIR shows that the university will be able to complete that work in the next three years. So if we look at the original project here, the federal project, had a 10-year time span. Even if we used 2015 to start the clock, that would allow for work to be completed by 2025. If this court acts today and restores that permit, the university is able to complete that work. And just to sort of make an apples-to-apples comparison here, the maps that are presented in the EIR notice show the same areas of Strawberry and Claremont Canyon, but there's a roughly 30% reduction in the acreage because those are the species areas. There's about 30 acres of species between these two areas, which together are about 99 acres total. So those areas will remain vulnerable to fire risk unless and until the university goes through the entire process. I'm seeing a lot of time, but let me just close by emphasizing the plain language here shows that this is not a pinning project. This is the same project that the university has been pursuing. The university has removed all of the other obstacles. With the take permit restored, the university can complete the same work studied in the FEMA EIS, approved in the ROD, and within the timeframe allowed by the FEMA project. Thank you. Thank you, Counsel. So who will be arguing? Mr. Richman? Yes, I will, Your Honor. I'll begin. Good morning, Your Honors, and may it please the Court. My name is Ben Richman on behalf of Federal Appellees. With me is Brian Cannon, who will argue on behalf of State Appellee for three minutes. And Tamara Gallanter, available for questions for Defendant Intervenor, East Bay Regional Park District. Your Honor, this case is moot for four reasons. First, the university rescinded the original project that was the subject of this suit. Second, the university then replaced that original project with a new revised project. Third, no effective relief can be delivered here for the university. And fourth, FEMA did not cause the university to rescind its original project. Beginning with this first point, Your Honor, the case is moot because the university rescinded the original project as part of a strategic litigation decision related to state court litigation. HCN, the citizen group, challenged the university's project for its failure to comply with CEQA and moved for a preliminary injunction against the project. The state court granted that preliminary injunction, and it wasn't until after the injunction was entered that the university made a strategic decision to rescind the original project. It did so in the document in which it rescinded the project to specifically reference it did not want to incur the cost of continuing to litigate that HCN state court suit, and its understanding was rescinding the project would moot that suit. And in its dismissal that it entered with HCN, that document said that the rescission of the original project would likely moot the case. So the rescission of the project mooted that state court suit. It moots this case too. Your Honor, the second reason this case is moot is because after the rescission, the university replaced the original project with a new, different project. Your Honor, the first project here dating back to 2005 was for two areas in Strawberry Canyon and Claremont Canyon, covered about 99 acres, and it used a vegetation methodology of eradicating invasive species of trees. And I'll quote from the final EIS, quote, 22,000 trees will be cut down. The purpose of that project was to eradicate these invasive trees. The eucalyptus, the Monterey pine, also the acacia. When the university, though, moved on and after it had rescinded the project, it started a new revised project, and that revised project used a different vegetation methodology, vegetation management methodology, excuse me. That methodology did not plan to, quote, cut down 22,000 trees. It planned to use a thinning methodology. And the scope of work entered into with CAL FIRE provided for thinning the forest, removing ladder fuels, removing the understory, and creating a forest of widely spaced tall trees. It did not call for specifically eradicating the eucalyptus. Your Honor. I have a question for you. So the goal of the project is the same, to prevent these very dangerous fires that this area is at risk for. Why does the fact that maybe the approach has been refined make it a different project? As I understand your first project, it was called, the first project used a unified methodology, which also relied on thinning to some extent. And I just would imagine that in some areas thinning would be better than removal of the trees. And I'm just wondering, how does that make it a different project if the end is the same, the area is the same, it's just you're approaching the problem in a different way? Right, Your Honor. So the unified methodology was on just 22 acres of the 99 in the original project. And that did provide for a thinning methodology, although it would result in removing overstory within four to five years, I believe. But, Your Honor, the reason why these projects are different is because they have profoundly different implications in what these methodologies actually do to the natural environment. And you can see that, Your Honor, in the biological opinion. The biological opinion developed by Fish and Wildlife makes specific findings for endangered species based on these different methodologies. And it finds that, for example, the clear-cutting, the eradicating of eucalyptus provides new scrub habitat for endangered species, such as the Alameda Whipsnake. That's at SCR 117. That has a very beneficial effect, and that's how Fish and Wildlife got to an incidental take statement for the biological opinion in the original project here. But the revised project is using more of a thinning methodology. And when the biological opinion looked at thinning in the context of a different project, it found that thinning would not benefit the Alameda Whipsnake, and it did not create the same type of habitat. So, Your Honor, we can see just in the environmental consequences on the ground, the projects had different results. And also, I'll add, Your Honor, that the logistical and technical differences between the projects, you should not pass over them as well. I mean, the new revised project is funded by $3.6 million from CAL FIRE, more than six times what FEMA could provide in the grants here. The revised project also covers 800 acres of the Hill Campus, specifically targeting vegetation management and about 250 of those acres, whereas the original project is just for 99 acres. And the new revised project, as provided by CAL FIRE, would require a three-year project by, I believe, 2022, whereas FEMA's original project is going to be on a 10-year timeline. All of these differences here, Your Honor, that I've discussed were found by the district court. They established all these facts and the differences between the original project, which was focused on clearing overstory, and the revised project focused on clearing understory and thinning. All of those facts, Your Honor, facts established in a mootness inquiry by the court, are subject to review, and this goes to your question earlier, Judge Bea, about a clear error standard. That's from Rocky Mountain Farmers, which is at 913 F3D 940, and is the proper standard of review for reviewing facts. Of course, it is a de novo inquiry for a legal question about mootness, applying facts to law. And, Your Honor, what these differences establish between the projects is the university abandoned the original project, and when the project that is the subject of an action is abandoned, the case is moot. I want to move on now, Your Honor, to effective relief. This is really the hallmark of mootness, whether any effective relief can be provided. The university is asking for the amended rod to be rescinded, and is asking for grant funding to be restored, and the biological opinion to either be restored, or the university's ability to rely on that biological opinion to be restored. None of this relief is available because the university rescinded the original project and replaced it with a different project. As for the grants, the grants were provided to the original project. They cannot be provided to a new revised project, which I'll add that the university already has funding for from Cal Fire. The original project also falls within the scope of the EIS, developed by FEMA over many years, almost dating back more than 10 years. The revised project is no longer within the scope of that EIS developed by the agency. And the grant awards here also have a specific provision, which state that if there are any changes in the underlying project, those changes would need to be approved by FEMA. So simply rescinding the amended rod on its own would not restore the grants here. But, Your Honor, the crux of this case is really the biological opinion. That, in the district court, is what the university said it was pursuing this project for. And the biological opinion, as I described earlier, in terms of the differences in habitat creation for the Alameda whipsnake, it analyzed the original project and the methodology of, you know, removing 22,000 trees, specifically eucalyptus trees, and how that would benefit the whipsnake. But with this new revised methodology being implemented by the university in the revised project, you know, Fish and Wildlife has not developed a biological opinion and studied the implications of this new methodology. Thinning the forest, removing ladder fuels, creating widely spaced forests of trees, that's all at 3 ER 483 from the scope of work in the CAL FIRE contract. You know, the Fish and Wildlife cannot provide relief because, you know, its biological opinion, the basis of its opinion, is rooted in the old original project which has been moved on for. And that's why, Your Honor, the biological opinion here, the regulations promulgated by Fish and Wildlife, and the case law in the circuit all provide that when the underlying project changes, a biological opinion no longer applies to that project and cannot be used for that project. And, Your Honor, that is why the biological opinion cannot be restored. So what this comes down to, Your Honors, is whenever an agency does any type of environmental compliance work, whether it be through NEPA, whether it be through the ESA, whether it be the many different regulations, EOs, and statutes which were analyzed and incorporated into the rod here, the agency relies on a record, the agency record, and that agency record here is developed for the original project. But because the university has moved on, has rescinded that old project and moved on to a new project, the agency record can no longer be relied on and it cannot be restored. So no relief here can be provided. I do, Your Honor, want to briefly talk about some of the factual matters which were brought up in opposing counsel's arguments, specifically about the EIR's initial study, the scoping notice in 2019. And counsel is right that the scoping notice does provide for taking down some overstory. But taking down some overstory is not taking down the 22,000 trees which were provided for in the EIS. And I'll quote from 2ER125, which I think counsel mentioned as well, UC Berkeley would evaluate trees and shrubs for vertical and horizontal spacing, removing tall, unhealthy, structurally unsound, or highly flammable trees. What the university is saying here in this updated CEQA document is that it is essentially applying some sort of maybe mushy factor test to decide which trees within the project areas it would like to take down. That sort of multi-factor test and looking at all these different aspects of whether you should take a tree down is much different than the eradication perspective which was promoted in the original project. Taking down 22,000 trees is not the same as talking about whether a tree is too tall, too unhealthy, or too fire-prone to maybe take down within the project area. And fourth, your honor, there's one more point I'd like to cover, and that's that FEMA did not cause the university to rescind the project here. We know this, your honor, because after FEMA rescinded its original grant here, the university proceeded with its project. It proceeded to litigate against the HCN state court injunction, and during those proceedings before the Alameda County Superior Court, it made statements that it did not want to delay the project. This is after it had lost FEMA grant funding, and it was only until after that preliminary injunction was entered that the university then made the strategic decision to moot out this case by rescinding the project. Your honor, any causal link here is very attenuated. You know, even if FEMA had not rescinded the funding here, the university would be facing significant problems in trying to go forward with that original project because of the preliminary injunction, as well as because of the fatal flaws in the CEQA analysis, which was then abandoned when the university moved on to a revised project. Your honors, unless there are any other questions for your honors, from your honors, excuse me, I would like to rest Federal Appellee's case here. All right. Thank you, counsel. Mr. Cannon? May it please the court, Brian Cannon on behalf of Cal OES Director Mark Ghilarducci. I'm here to address solely the 11th Amendment issue, which the court must consider if it rejects the mootness finding of the district court, and may elect to address otherwise. As your honors know, federal courts only have jurisdiction over a state if there is express waiver of immunity or pursuant to the narrow ex parte Young exception. But the university conflates waiver and the Young exception to claim that the state's role receiving and distributing these federal funds constructively waives its immunity and is an ongoing violation of federal law. The Supreme Court has held that it is impossible for a state to constructively waive its sovereign immunity, yet the university asserts on reply at page 24, quote, Ghilarducci has waived his 11th Amendment immunity in this action because Cal OES played an essential and ongoing role as the sole recipient of PDM grants. This mashup of theories is incorrect and impermissible, and to the contrary, state and federal statutes explicitly retain immunity for Cal OES and FEMA. Turning to the Young exception, the university was required to do three things that it did not do. First, its complaint needed to specifically seek prospective relief against Cal OES, yet the university's prayer for relief does not even identify Cal OES. Second, the university needed to have a valid cause of action against Cal OES, yet it did not. An APA challenge against the state is only permissible when there are no sovereign immunity concerns and a state's absence renders relief nugatory. For this APA Stafford Act claim, any relief can be directed only at FEMA, not Cal OES. And third, the university needed to establish that Cal OES is committing specific ongoing violations of federal law requiring prospective relief. Instead, the university asked for declaratory judgment on whether Cal OES properly gave consent five years ago. Clearly voiding years-old termination agreements is retrospective. And finally, as we discussed earlier, the relief it primarily seeks, a reinstatement of its ESA permit, is relief that Cal OES has no role in. No NEPA claims implicate Cal OES. For these reasons, the state's 11th Amendment sovereign immunity is in full force in effect and Director Ghilarducci should be dismissed for lack of jurisdiction. Thank you. Thank you, counsel. Mr. Tangri, you were out of time, but I'll give you five minutes or less to just rebut those points. Thank you, Your Honor. I appreciate that. Let me start with the mushy factor test that FEMA's counsel enunciated. In trying to distinguish the revised project from the prior project, I would ask the court to look at the language at ER 871 to 872. The language that was quoted by FEMA's counsel describing the criteria for maintaining trees in the revised project is virtually word-for-word identical to the criteria for retaining trees in FEMA's original revised project. As Your Honor asked and identified, the prior project certainly included the ability for all of the applicants at the University of the Park District and Oakland to determine how best to apply the methodologies to the varying topographies and different fire characteristics across what was at that time a nearly 1,000-acre area with very different characteristics. So FEMA's attempt to pigeonhole the project as a – the primary project as an eradication, removal-only project, both disregards what was actually approved by FEMA in 2015, and it's certainly not consistent with what's approved here. I will just cite very quickly the language from the evidence regarding the revised project. All four documents, the EIR scoping notice talks about manually and mechanically removing high-fire hazard vegetation trees. That's ER 125. The declaration from the Associate Vice Chancellor at ER 725 talks about conversion of existing fire-prone forest to woodland with more favorable burning characteristics. Third, the request for qualifications, ER 607, talks about removing hazardous trees and shrubs. And fourth, the CAL FIRE grant agreement, the document – the sole document cited to you by Judge Feeler in finding that this was a different project talks expressly about trees – whole trees being cut and chipped at pages ER 483 to 84. That is the plain language of those documents, and that's the clear error. And I think counsel's argument emphasizes that whether or not the projects are the same is essentially the argument that FEMA is making. I would point the court to the two cases discussed by Judge Feeler with regard to the supposed voluntary abandonment, two very different situations, but the PUC case in particular talked about – in both those instances, you had the applicant, the party that was advancing the project, or in one case, standing for election, deciding that it would no longer do so and coming to the court and saying, we no longer seek this relief. That is a clearly different situation than what we have here, where the university believes that the relief is valid and can be implemented, and frankly, voiding the improper termination would put us back where we were in 2016. The court there talked about – sorry, this is a Public Utilities Commission case, 100 F. 3rd at page 1458, and I quote, neither Mojave Pipeline nor any other company has filed an application for a similar proposal. I think this court recognized that a similar proposal could continue to be relevant for this court to consider with regard to mootness. I will also – let me just address quickly the point that the university's rescission is the cause here. It's not the cause. It's the symptom. The university's rescission occurred several months after Fish and Wildlife Service told the university it could not advance its work. There's obviously well-established case law that identifies that when an endangered species may be impacted, a take permit must be in place or it's unlawful for the work to proceed. FEMA's termination, again, several months before that rescission. The rescission states we have lost the funding. That's the FEMA piece of it, and we have been stopped by the state court. Yes, unquestionably, there was a strategic decision to try and limit fees, and we could not go forward at that time. We have rectified the CEQA piece, and if it's important to the court, again, we can provide through judicial notice the final EIR. That's the CEQA compliance to address the state court's piece. So the university now has dealt with the state court process to be able to go forward. Now all that remains is the hurdle of obtaining the take permit. This court can grant relief that would allow that work to start this year and be completed. In the absence, the university will be forced to go through what the park district has said to this court is a 10-year process, and that 10-year process could hold up work not just for the 30 percent of the acreage where the species occur, but all of the surrounding areas in Claremont and Strawberry Canyon, the most fire-prone areas within the Hill Campus area. And with that, I will rest. Thank you, Your Honors. All right. Thank you very much, Counsel. Regents of the University of California v. FEMA will be submitted, and we will take up U.S. v. Sharma, Singh, and Singh.
judges: Tashima, Wardlaw, Bea